**In the Matter of James & Patricia MAR-
TIN, William & Ruby Martin, Charles
& Linda Martin, Debtor(s).**

**Bankruptcy Nos. 85–357 to 85–359.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Aug. 1, 1985.

Jawdet I. Rubaii, Clearwater, Fla., for James and Patricia Martin.

Edward Waller, Tampa, Fla., for William and Ruby Martin and Linda and Charles Martin.

John T. Allen, St. Petersburg, Fla., for Pinellas County.

---

**10.** *See* note 1, *supra.*

Thomas Mimms, Tampa, Fla., for Charles and Linda Martin.

Jary Nixon, Tampa, Fla., for Citrus Park Bank.

## ORDER ON MOTION TO DISMISS OR CONVERT; ORDER ON MOTION FOR REHEARING AND MOTION TO FIX PROCEDURE TO LIQUIDATE CLAIMS

ALEXANDER L. PASKAY, Chief Judge.

THIS IS one more instance, recently occurring, with great frequency, when the right of a debtor to seek relief under Chapter 11 is challenged. This challenge is usually interposed by a motion which seeks a dismissal of the Chapter 11 case, although at times it is interposed indirectly by a motion which seeks relief from the automatic stay, imposed by § 362 of the Bankruptcy Code. See, *In re Victory Construction Co., Inc.*, 9 B.R. 549 (Bankr.C.D. Cal.1981).

In the present instance, the matter is presented for this Court's consideration by several motions filed by the County of Pinellas, a political subdivision of the State of Florida (County). The first group of Motions filed by the County all relate to these Debtor's rights to the protection afforded by the automatic stay and are presented in the following forms: (1) Motion for Rehearing, directed to a previous Order of this Court entered on the Second Motion of Pinellas County to Lift and to Clarify the Automatic Stay; and (2) a Motion to Fix Procedure for Liquidating Claims.

In addition, the County also seeks a dismissal of these three Chapter 11 cases, which are treated together for sake of expediency, albeit not consolidated either procedurally or substantively. The County seeks a dismissal pursuant to § 1112(b)(1) for "cause" and the "cause" is alleged to be lack of good faith of these Debtors to seek relief under Chapter 11 of the Bankruptcy Code.

The facts as appear from the record established at the evidentiary hearing which are relevant to the issues raised by the Motions are as follows:

At the time relevant to the matters under consideration, the County was, and still is, the owner of a wellfield known as Eldridge-Wellfield, located in Northern Pinellas County. The wellfield is the principal source of water for the residents of Pinellas County. The Debtors in these Chapter 11 cases are three brothers, William, Charles and James and their respective spouses, Ruby, Linda and Patricia Martin. They are the owners of a large tract of land located in Northwest Hillsborough County. Their landholding borders on the County line which separates Pinellas and Hillsborough counties.

Prior to 1982, the Martin brothers maintained a borrow pit adjacent to the wellfield and also a second borrow pit located approximately one-half to three-quarters of a mile upgradient from the wellfield. The Martins, in connection with their borrow pit operation, dug the dirt from the land and sold the excavated dirt to the construction industry in general. It appears that both borrow pits were, from time to time, filled by the Martins with various fill materials, both organic and inorganic, which according to the County, were highly toxic. The County became apprehensive of the effect of the activities conducted by the Martins on their land, especially the possible impact of the fill operation on the wellfield and, therefore, filed a Complaint in the Circuit Court in and for Pinellas County in 1982. In that action the County sought a mandatory injunction against the Martins. The Circuit Court granted an emergency Motion filed by the County and directed the Martins to immediately remove all land fills from the borrow pits and to dispose of the fill removed from the borrow pit in an ecologically acceptable manner with due and deliberate speed. The Circuit Court also prohibited the Martins to dump any additional material in the borrow pits. The appeal filed by the Martins from this Order was affirmed by the Second District Court of Appeals. *Martin v. Pinellas County*, 444 So.2d 439 (Fla. 2d DCA 1983).

On April 11, 1983 the County filed an Amended Complaint in which it charged the Martins with trespass, maintaining a public and private nuisance and negligence. In this action, the County sought compensatory and punitive damages against the Martins, in addition to a permanent injunction prohibitive and mandatory in nature.

The claims asserted by the Amended Complaint were scheduled for trial and after several continuances, the trial was scheduled to commence on April 8, 1985. In the interim, the County also instituted a civil contempt proceeding against the Martins based on their alleged violation of the original injunction granted by the Circuit Court on the County's emergency Motion mentioned earlier. The hearing on the Motion for Contempt was scheduled to be heard on February 19, 1985. However, in order to stop the contempt proceeding, the Martins filed their respective Petitions for Relief under Chapter 11 on February 14, 1985, or 5 days before the scheduled hearings on the contempt proceeding were to commence. The Petitions filed by the Martins, of course, brought all proceedings in the Circuit Court to an abrupt halt.

. The County immediately sought relief from the automatic stay by filing a Motion. The Motion was promptly scheduled by this Court and after a hearing, this Court granted the Motion, in part, and authorized the County to proceed, but only with the contempt proceeding in the state court. This Court reaffirmed and extended the automatic stay concerning the remaining portions of the actions filed against the Martins in the Circuit Court. This Order was later modified by this Court and the County was authorized to proceed with the criminal contempt proceeding against the Martins which was scheduled to be held by the Circuit Court on April 22, 1985.

The State of Affairs filed by the Martins with their Petitions for Relief, together with their testimony at the Meeting of Creditors, leaves no doubt that the Debtors are not engaged in any business of any sort at this time. They do not sell any goods; do not render any services; do not have any employees; do not maintain a regular place of business and their sole income is monies received in the past from a previous sale of part of their land holdings, sold on an installment contract under which they will receive one more installment next year in the approximate amount of $52,000. In addition, they share equally in a monthly payment from a tenant who is currently renting a small house owned by them as co-tenants. From this house they each receive $200 a month.

The Schedule of Assets and Liabilities filed by Charles and Linda Martin reveal a liability owed by them for real estate taxes in the amount of $2,815.30. They also scheduled unsecured obligations, without priority, of $91,790.34. This does not include the unliquidated claim asserted against them by the County, but includes an obligation in the amount of $64,246.46 owed to their counsel of record, the law firm of Fowler, White, Gillen, Boggs, Villareal & Banker, the same law firm which represented them in the state court litigation.

Due to the fact that the Martin brothers owned several tracts of land together, located not only in Hillsborough County, but also in Marion, Dixie and Taylor counties, it is very difficult to determine, with precision, the respective liabilities encumbering these landholdings between the three brothers. Be that as it may, it appears that the total landholdings of the brothers is valued in excess of $890,000 and is encumbered by combined secured obligations in the amount of $418,415. In absence of any evidence to the contrary, it is fair to assume that the respective interest in the land is $353,500, although the correctness of this number might not be exactly in that Charles and Linda also owned a tract of land free and clear which is valued at $250,500. In sum, while it is not possible to determine the precise extent of the Debtors' total landholdings. there is hardly any question that the value of their assets just in real property substantially exceeds their liabilities, and clearly exceeds the debt which is secured by the landholdings.

It developed at the Meetings of Creditors that after the commencement of these cases, all three Martins continued to pay their pre-petition unsecured obligations and maintained them on a current basis. It further appears that while prior to the commencement of these cases, the Martins attempted to market part of their landholdings, the only parcels which are currently offered for sale are the 20 acre tract located on Taylor Road and one tract of land located at West Hillsborough Avenue in Tampa, Florida.

The exclusive right to file a Plan of Reorganization granted to the Debtors by § 1121(b) has already expired. There is no Plan or Disclosure Statement on record in any of these cases. It is without dispute that the most important and the greatest unsecured debt facing the Martins is the unliquidated claim of the County. In fact, there is hardly any doubt that but for this claim and the pending litigation, the Martins would not have the need to resort to the protective measures available to Debtors in general under the Bankruptcy Code. It has been conclusively established from the testimony of the Debtors that had there been no litigation with the County concerning the borrow pit operation, there would not have been Chapter 11 cases filed.

As noted, the claim of the County is unliquidated and no doubt this claim will have to be liquidated either through litigation or settlement or possibly through estimation before this Court could possibly consider a confirmation of the Plan of Reorganization, if one is ever filed. In light of the past history of the litigation between the County and the Martins, it is highly unlikely that this problem could ever be resolved amicably, and if the County ultimately prevails and establishes a claim in any significant amount, the Martins' ability to procure the County's acceptance of any Plan of Reorganization is questionable. Further, it is clear that in light of the highly solvent status of these Debtors, they would not be able to resort to the cram down provision provided by § 1129(b)(2)(B).

This is the relevant historical background of this long battle between the County and the Martin brothers. In order to complete the actions against the Martins, the County filed several Motions, now under consideration by this Court, which bring several important issues to the forefront. It brings into focus the extent and reach of the automatic stay; the applicability of the automatic stay to the action pending in the Circuit Court; the question of "good faith" of these Debtors to seek relief under Chapter 11; and lastly, a determination by this Court as to the proper procedure to liquidate the money damage claim of the County against the Martins.

A resolution of the Motion to Dismiss presents a threshold question. Thus, one must first consider the merits of this Motion. Although "good faith" is required for confirmation of a reorganization plan, 11 U.S.C. § 1129(a)(3), Chapter 11 does not expressly condition the right to file or maintain a case on the "good faith" of the debtor at the time the case is initiated. However, § 1121(b) of the Code permits a bankruptcy court to convert or dismiss a case for "cause." The provision lists nine examples of "cause", but the list is not exhaustive. The pertinent legislative history states that

> "The court will be able to consider other factors as they arise, and use its equitable powers to reach an appropriate result in individual cases." *H.R.Rep. No. 595, 95 Cong., 1st Sess. 406 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6362*

█ Accordingly, the determination of "cause" under § 1112(b) is "subject to judicial discretion under the circumstances of each case." *In the Matter of Nancant,* 8 B.R. 1005, 1006 (Bankr.D.Mass.1981). In finding a lack of good faith, courts have emphasized an intent of the Debtor to abuse the judicial process and the purposes of the reorganization provisions is an important fact to be considered.

The issue of "bad faith" is usually raised in the context of a controversy between a secured creditor and a debtor, where the

courts frequently hold that if a debtor merely seeks to delay or frustrate the legitimate efforts of a secured creditor to enforce its rights, a dismissal is appropriate. See, *In re Eden Associates*, 13 B.R. 578, 583–85 (Bankr.S.D.N.Y.1981); *In re Victory Construction Co., Inc., supra; In re G–2 Realty Trust*, 6 B.R. 549, 552–54 (Bankr.D.Mass.1980); *In re Dutch Flat Investment Co.*, 6 B.R. 470, 471–72 (Bankr.N.D.Cal.1980); See also, *In the Matter of Levinsky*, 23 B.R. 210, 219–20 (Bankr.E.D.N.Y.1982); *In the Matter of Northwest Recreational Activities, Inc.*, 4 B.R. 36, 38–40 (Bankr.N.D.Ga.1980); *In re Albany Partners, Ltd.*, 749 F.2d 670, 12 BCD 787 (11th Cir.1984). It is clear, however, that the improper purpose of a Debtor to seek relief should not be limited to the factual situations involved in these cases in which most, if not all, debtors were not operating an ongoing business.

Based on this fact, the County places great emphasis on the undisputed fact that the Martin brothers are not engaged in business in a conventional sense. Considering the proposition urged by the County that these Chapter 11 cases should be dismissed because these Debtors are not engaged in business, it should be pointed out at the outset that there is nothing in the eligibility section of the Code, § 109, which directly or indirectly provides that a Debtor must be engaged in business before a debtor is eligible for relief under Chapter 11. The fact of the matter is that when one considers the historical background of the current Chapter 11, it is evident that the contrary is true. Prior to the enactment of the Code, corporations, individuals or partnerships were eligible to seek rehabilitation under the Act of 1898, either under Chapter X, XI and XII, respectively. Out of these three relief chapters, Chapter XII, a/k/a real property arrangement, was designed to furnish means for financially embarrassed individuals or partnerships to achieve a rehabilitation through rearrangement of secured indebtednesses encumbering real properties. Many of these Debtors owned a single asset and filed a Petition for Relief solely to save that particular real property through prevention of loss as the result of a pending foreclosure proceeding. Many of the Debtors were never engaged in any business in a conventional sense, but invested in real property either hoping the anticipated profit would appreciate in value on the property or to save on taxes through tax shelter schemes. Yet there is no doubt that they were eligible for relief under this Chapter. The current relief Chapter 11 represents a fusion of the rehabilitative schemes of the former Chapter X, XI and XII and is available to the same type of debtors who were eligible under the pre-Code relief Chapters. To conclude without anything further that under the current law, a debtor is not eligible for relief unless the Debtor is engaged in business would not only belie the historical background of this Chapter, but would be plainly contrary to the congressional intent evidenced by the entire statutory scheme of Chapter 11 of the Code.

■ While there is substantial authority for the support of the proposition that the relief available under Chapter 11 is restricted to corporations and individuals which are engaged in business, *In re Zelda Moog*, 46 B.R. 466, 12 BCD 1183 (Bankr.N.D.Ga.1985); *In re Winshall Settlor's Trust*, 758 F.2d 1136 (6th Cir.1985), this Court is not prepared to place such a narrow construction on a Chapter 11 and is of the view that the presence of absence of "good faith" must be determined on a case by case basis, considering all factors relevant to the resolution of the question. Most importantly, it requires an indepth inquiry of the Debtor's motive for instituting the entire case in order to determine the real purpose of a debtor seeking relief under this Chapter and determine whether such purpose was consistent with the policy aim of Congress enacting this Chapter.

■ From this it follows that the fact that these Debtors are not engaged in business is not enough by itself to conclude that their Chapter 11 should be dismissed.

The real and controlling question is, whether or not these Debtors invoked the

protection afforded by Chapter 11 of the Code for a legitimate and proper purpose or for a purpose which is improper and inconsistent with the congressional intent. See, *In re Winn,* 43 B.R. 25 (Bankr.M.D. Fla.1984); *Victory Construction Co.,* 9 B.R. 549 (Bankr.C.D.Cal.1981); *Furness v. Lilienfield,* 35 B.R. 1006 (D.Md.1983); *In re Dutch Flat Investment Co.,* 6 B.R. 470 (Bankr.N.D.Cal.1980). In all these cases the courts concluded that the Petitions were not filed in good faith because the debtors sought protection in the Bankruptcy Court for the sole purpose of frustrating a legitimate process of a non-bankruptcy forum, i.e. *In re Winn, supra* (attempt to escape contempt proceedings); *Furness v. Lilienfield, supra* (to frustrate forfeiture suits filed by the Government).

While it is true that in addition to the injunctive relief, the County also seeks a substantial money judgment for damages, this alone is not sufficient to justify to maintain this case as a Chapter 11 case. The primary, if not sole, aim of these Debtors is, no doubt, nothing more than to escape the financial consequences of their alleged conduct of polluting the environment, in this instance, the water source of the County. Without intimating any view in advance, it should be noted that there is authority for the proposition that an obligation of an individual debtor to clean up toxic waste or in the alternative, to pay for the cost of cleaning up the toxic waste is a "claim" against the individual under § 101(4) and the individual who owes a "debt" within the meaning of § 101(11) of the Bankruptcy Code based on such claim, this may be discharged in a Chapter 7 case, *Ohio v. Kovacs,* 469 U.S. ——, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), but this alone would not justify to maintain this case in this Chapter.

Be that as it may, based on the facts described above, this Court is satisfied that these Petitions were not filed for purposes contemplated by Congress in drafting Chapter 11 of the Bankruptcy Code. As noted earlier, these Debtors are not engaged in any business; they are financially able to handle all their debts and it is clear that the sole purpose for filing their respective petitions was to frustrate the efforts of the County to prevent these Debtors to continue to pollute the wellfield and to compel them to undo what has already been found to be a conduct hostile to the surrounding environment, to wit: to the primary source of water to the County. There is no doubt that the cases were filed to resolve, or at least delay, a two party dispute between the Debtors and the County. It is this Court's opinion that this is an inappropriate use of Chapter 11. Therefore, the cases shall be dismissed. Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motions to Dismiss filed by Pinellas County be, and the same hereby are, granted and the above-styled Chapter 11 cases be, and the same hereby are, dismissed. It is further

ORDERED, ADJUDGED AND DECREED that the Motion for Rehearing or for Abstention filed by Pinellas County be, and the same hereby are, denied as moot. It is further

ORDERED, ADJUDGED AND DECREED that the Motion to Fix Procedure for Liquidating Claims be, and the same hereby is, denied as moot. It is further

ORDERED, ADJUDGED AND DECREED that the Clerk of the Bankruptcy Court shall provide notice of the dismissal of the above-styled cases in accordance with Bankruptcy Rule 2002(f).