## In re BICOASTAL CORPORATION d/b/a Simuflite, f/k/a The Singer Company, Debtor.

### Bankruptcy No. 89–8191–8P1.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Dec. 11, 1989.

See also, Bkrtcy., 111 B.R. 999.

Harley E. Riedel, Tampa, Fla., Donald E. Engle, St. Paul, Minn., for debtor.

Carole Fern, New York City, Michael P. Brundage, Tampa, Fla., Local Counsel, for movant.

## ORDER ON MOTION TO DISMISS

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case and the matter under consideration is a Motion to Dismiss the case filed by CAE Industries, Ltd. (CAE), one of the largest creditors of Bicoastal Corp., d/b/a Simuflite, f/k/a The Singer Company (Bicoastal), Bicoastal. The Motion filed by CAE was initially based on the contention that this Chapter 11 case must be dismissed because the filing was not authorized by the Board of Directors. In addition, the Motion also sought a dismissal for cause contending that the Petition was filed in bad faith in that it was filed for the sole purpose of frustrating the holder of preferred stock, Mesa Holding Ltd. Partnership (Mesa), to exercise its right to convert its nonvoting

preferred to a voting preferred stock and, in turn, to elect a new Board of Directors. CAE also contended that the Petition was filed for the purpose of frustrating valid outstanding orders of two United States District Courts. In sum, it is CAE's contention that the Petition was filed to achieve an improper and impermissible purpose, therefore should be dismissed for "cause" pursuant to Section 1112(b) of the Bankruptcy Code.

At the outset, counsel for CAE announced that it no longer desired to pursue the contention that the Petition filed by Bicoastal was unauthorized and, therefore, should be dismissed. This leaves for consideration the other contentions of CAE which is that the Petition was filed in bad faith and, therefore, it is appropriate to dismiss the Chapter 11 case for "cause" pursuant to Section 1112(b) of the Bankruptcy Code.

The facts as established at the final evidentiary hearing which are germane and relevant to the issues raised by the Motion are as follows:

The controlling interest of Bicoastal, formerly known as The Singer Co., was acquired through a leverage buyout by Bilzerian Partners, Ltd., Partnership I (Bilzerian Group). Financing for the stock acquisition was provided by a consortium of banks, Shearson Lehman Brothers Holdings, Inc., Mesa and Bilzerian Group. At the time of the acquisition, The Singer Co. owned all outstanding shares in several subsidiaries numbering more than twenty, employing in excess of 3,000 people. It also operated, and is still operating, a division known as Simuflite at the Fort Worth–Dallas International Airport. Simuflite has approximately 250 employees and Bicoastal employs about 20–25 people who are performing administration chores for the subsidiaries and at times in the past, financially assisted some of the subsidiaries.

CAE is a Canadian corporation which acquired four of the subsidiaries from Bicoastal, including one known as Link Flite. This particular transaction is the basis of a hotly contested litigation between CAE and Bicoastal pending in the United States District Court for the Southern District of New York. The controversy centers around a disagreement between the parties as to the proper purchase price. It is the claim of CAE that the purchase price was overinflated and it seeks to recover the excess claimed to be approximately $60 million. It is the position of Bicoastal that the price was underestimated and CAE owes to Bicoastal an additional $8–$10 million. In the New York litigation, CAE also sought a declaration that by virtue of the contract, Bicoastal must submit to a binding arbitration. CAE was successful in early November and obtained an order from the District Court requiring Bicoastal to post an irrevocable letter of credit in the amount of $43 million in favor of CAE in order to assure that in the event CAE prevails on its claim, the funds would be available to satisfy its claim.

The record further reveals that prior to the acquisition of a controlling interest of Singer by the Bilzerian group, Singer has several government contracts with the United States of America (Government). It appears that the Government took the position that The Singer Co./Bicoastal overcharged the Government on some of these contracts and submitted fraudulent claims to the Government. Based on the foregoing, the Government filed a suit in the District Court of Maryland in which it claims that it is entitled to compensatory damages in the amount of $77 million and under the Fraudulent Claims Statute, is entitled to treble that amount and to recover $243 million. *False Claims Act, 31 U.S.C. §§ 3729–3732 As amended by the False Claims Amendment Act of 1986, Pub.L. 99–562, 100 Stat. 3153 (1986).*

Significant events occurred in this lawsuit which have heavy bearing on the matter under consideration. In May, 1989, the United States District Court for the District of Maryland issued an injunction which prohibited Bicoastal to sell any of its assets without approval; to pay any obligations out of the ordinary course of business; to pay any pre-petition obligations, even those incurred in the ordinary course of business. In addition, the District Court

limited all post-petition payments on obligations incurred in the course of Bicoastal's business unless otherwise approved by the Court. Finally, the injunction prohibited payment of dividends to preferred stockholders and any payment to Mesa or Shearson. Thus, while on one hand Bicoastal was directed to post an irrevocable letter of credit in excess of $43 million in the New York litigation, it was prevented by virtue of the injunction of the District Court of Maryland to expend any funds other than for the purposes set forth in the injunction or to sell or pledge any of its assets in order to procure the funds necessary to purchase the irrevocable letter of credit ordered by the District Court in New York.

In this connection it should be noted that the Bank of Nova Scotia had already earlier issued an irrevocable letter of credit on behalf of Bicoastal in excess of $93 million. The letter of credit was issued to assure that operating subsidiaries, notably Simuflite, would satisfactorily perform certain pending contracts and it was issued in favor of creditors who were and are furnishing goods and services to Simuflite in connection with those contracts. This letter of credit is secured by all free assets of Bicoastal and counsel for the Bank of Nova Scotia stated unequivocally that it is unwilling to extend any further credit to Bicoastal.

On October 22, 1989, Bicoastal's liability to the Bank of Nova Scotia matured, and Bicoastal became obligated to pay the Bank the sum of $93 million. Bicoastal defaulted on the obligation as the result of Bicoastal's inability to pay off or otherwise terminate Nova Scotia's letter of credit participation by October 22 as required by loan documents. As of that date, the Bank of Nova Scotia was in the position to exercise its rights under Article 9 of the Uniform Commercial Code and to otherwise exercise remedies available to it as a secured creditor unless Bicoastal was able to resort to the protection provided by the automatic stay imposed by Section 362(a) of the Code.

By this time, Bicoastal was also in default on its remaining debt to Shearson and to Mesa, obligations incurred by Bicoastal in connection with the leveraged buyout and the acquisition of the controlling interest of Singer. While it was intimated by counsel for CAE that Bicoastal was in fact successful at times since the issuance of the injunction to obtain permission from the District Court in Maryland to pay certain debts, there is nothing in this record which would warrant the conclusion that the Maryland court would indeed authorize Bicoastal to sell enough assets to generate the demand placed upon it by the order of the United States District Court for the Southern District of New York which required Bicoastal to post the irrevocable letter of credit.

There are a variety of other disputed claims asserted against Bicoastal. These claims include a suit filed by General Instruments who seeks approximately $34 million on account of post-closing adjustments in connection with one of the sale of Bicoastal's assets; a class action suit brought by Ralph Seel on behalf of certain retirees, who sought a pre-judgment attachment in the approximate amount of $235 million; a suit brought by two owners of the senior preferred stock seeking to assert claims under § 10(b) of the Securities & Exchange Act of 1934, Rule 10(b)–5 of the Commission's Rules, and common law, on behalf of a class of similarly situated shareholders; and, a suit brought by HSSM #7 seeking damages of approximately $40 million on account of an alleged breach of an agreement on behalf of the company and its sole common stockholder to repurchase a beneficial interest in the company. From the foregoing it appears, and there is hardly any question, that by early November Bicoastal was in dire financial straits. Even disregarding the various and sundry claims asserted against Bicoastal, many of them concededly contingent and unliquidated, it is not unreasonable to infer that in additional to the woes of Bicoastal described above, its major customers, the United States and foreign governments and the airlines would take a second look at its contractual relationship with Bicoastal and would tend to minimize or possibly cut their involvement with Bicoastal in the future.

It further appears from the record that Mesa, in early November, notified Bicoastal that it did intend to invoke a provision of the Certificate of Incorporation which authorized Mesa to convert its non-voting preferred to a voting preferred stock in the event Bicoastal defaults on its note obligation due to Mesa and would exercise its voting right and appoint a new Board of Directors. It should be noted that Mesa wasted no time and filed a emergency Motion to Lift Stay a few days after the Petition was filed. Mesa urged that the matter involved nothing but a controversy centering around corporate governance and, therefore, there is cause to lift the stay to permit Mesa to proceed with its lawsuit filed in a chancery court for the State of Delaware. In this action, Mesa sought a determination that it has a right to exercise the voting rights and to replace the board of directors of Bicoastal. On November 21, 1989, the Motion to Dismiss for lack of jurisdiction was filed by Mesa and its purported assignee, Leucadia National Corporation (Leucadia) which was denied by this Court having concluded that this Court has jurisdiction and the moving parties, CAE and Leucadia, failed to establish grounds to lift the automatic stay.

It is the contention of CAE that the Petition was filed in bad faith and, therefore, should be dismissed for cause pursuant to Section 1112(b). In support of its Motion, CAE points out that while it is true that the District Court of Maryland issued an injunction as far back as May of 1989, Bicoastal was able to function as a business and live with the injunction; that the possibility of filing Chapter 11 was not discussed by the two remaining board of directors until Bicoastal was notified of Mesa's intention to exercise its right to convert its non-voting preferred to voting preferred stock and replace the board of directors and the sole purpose to file the Chapter 11 case was to prevent Mesa to replace the board of directors which is clearly not a legitimate purpose and aim of Chapter 11, since it is nothing more than a controversy concerning corporate governance. *Citing, In re Bush Terminal Co.,* 78 F.2d 662 (2nd Cir.1935); *In re Saxon*

*Industries, Inc.,* 39 B.R. 49, 50 (S.D.N.Y. 1984); *In re The Lionel Corporation,* 30 B.R. 327 (S.D.N.Y.1983); *In re Johns Manville,* 801 F.2d 60, 65–67 (2nd Cir.1986).

In opposition to the Motion to Dismiss, it is Bicoastal's contention that as a result of the pending litigations against it, it was in dire need of the protection of the Bankruptcy Court. Bicoastal contends that it has an honest intention to reorganize and, most importantly, it is capable of reorganization provided it is permitted to resort to the remedial tools provided by Chapter 11, *citing, In re Julius Roehrs Co.,* 115 F.2d 723 (3rd Cir.1940); *In re Breeding Motor Freight Lines, Inc. v. Reconstruction Finance Corp.,* 172 F.2d 416 (10th Cir.1949).

■ There is hardly any question that a petition for relief under Chapter 11 for the purpose of stalling the inevitable, i.e. loss of the one and only property of the debtor through foreclosure, may very well be a petition filed in bad faith. *See, In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir.1984). It is equally recognized, and CAE is correct, that if a petition is filed to achieve an impermissible goal by a debtor who has no honest intention to reorganize, and who has no need to reorganize, such petition is properly found to be filed in bad faith. *In re Winn,* 43 B.R. 25 (Bankr.M.D. Fla.1984) (petition filed to escape the consequences of a civil contempt order issued by non-bankruptcy forum); *In re Port Richey Service Co.,* 44 B.R. 634 (Bankr.M.D.Fla. 1984) (the admitted purpose of a debtor to file a petition under Chapter 11 was to delay the enforcement of a non-appealed final decree of state court); *In re Martin,* 51 B.R. 490 (Bankr.M.D.Fla.1985) (petition dismissed for bad faith when it was clear that the sole purpose to seek relief in the bankruptcy court was to escape the financial consequences of polluting the environment). Relying on these cases, CAE contends that the conclusion is inescapable that the decision to file this petition was made only a few days before the actual filing and after Bicoastal was notified of the action proposed to be taken by Mesa. The cases cited by CAE in support of its proposition do in fact stand for the proposi-

tion that the Bankruptcy Court should not be involved in controversies concerning corporate governance. *In re Bush Terminal Co., supra; In re Saxon Industries, Inc., supra; In re The Lionel Corporation, supra; In re Johns Manville, supra.*

In viewing the sequence of events in a vacuum, one might, at first blush, accept this proposition. However, when one views the totality of the picture, it is clear that by early November Bicoastal was in very dire financial straits and unless it obtained the protection of the automatic stay imposed by Section 362 of the Bankruptcy Code, it would soon be placed in a situation from which it could no longer extricate itself. Thus, this is not the situation which was involved in *In re Waldron*, 785 F.2d 936 (11th Cir.1986); *In re Winn, supra; In re Port Richey Service Co., supra;* and *In re Martin, supra.*

■ While this Court does not deviate from its previous decisions that good faith of a Chapter 11 debtor is certainly a condition precedent to any debtor's right to maintain a Chapter 11 case and if it established that it is filed in bad faith, is subject to dismissal for cause under Section 1112(b), the question always must be resolved with on-the-spot evaluation of the debtor's financial condition and motives. *Matter of Little Creek Development Co.,* 779 F.2d 1068 (5th Cir.1986). This Court is not unaware of the decision of the Eleventh Circuit in *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11th Cir.1988). *Phoenix Piccadilly* was a fact intensive case and while Bicoastal had equity in the subject property the entire record reeked of malice, spite and ill-will by the debtor vis-a-vis the mortgagee; a debtor who purposely filed the Chapter 11 in the Middle District of Florida even though it had no meaningful nexus with this district. The Court of Appeals correctly concluded that if the original petition is tainted by bad faith, the fact that the debtor has equity in the property would not have a sufficient cleansing effect which would permit the debtor to maintain the Chapter 11 case. There is nothing in this case which even remotely indicates any of the factors which were controlling in

*Phoenix Piccadilly* and the reliance of CAE on that decision hardly furnishes any support for its contention that the petition by Bicoastal was filed in bad faith.

■ Unlike the cases cited by CAE in support of its position, Bicoastal has demonstrated to this Court's satisfaction that it has an honest intention to speedily proceed to reorganization and it has a real need and a real ability to effectuate the aim of Chapter 11. *In re Julius Roehrs Co., supra; Breeding Motor Freight Lines, Inc. v. Reconstruction Finance Corp., supra.* Bicoastal has an ongoing business with a very substantial operating division and has more than 3,000 employees. Bicoastal clearly did not file the Chapter 11 Petition merely to stall and to gain time in order to avoid the inevitable, i.e. loss of its only assets in the hope, albeit totally unrealistic, of finding a solution to its totally hopeless situation. The fact of the matter is, it filed its Disclosure Statement and Plan of Reorganization less than one month after the commencement of the case. The assets of Bicoastal currently have a book value in excess of $371 million and earned a net income of $70.2 million in the first nine (9) months of 1989. The filing of the Chapter 11 by Bicoastal, without doubt, affords to the United States the same protection it obtained in the District Court of Maryland and places CAE in a position which is not worse then it occupied prior to the commencement of the Chapter 11 case. After all, one should not forget that the claim of CAE is nothing but a general unsecured claim, so far unliquidated, contingent and disputed, thus, under no theory, would be entitled to treatment more superior than that which is accorded to other unsecured creditors of Bicoastal. This is not the case when a debtor has only one asset which it is about to lose to a secured creditor, *In re Little Creek Development Co., supra,* but has real creditors and preferred stock held by the public, all of which are entitled to the overall protection provided by the scheme established by Congress under Chapter 11.

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that the Motion to Dismiss filed by CAE Industries, Ltd. be, and the same is hereby, denied.

DONE AND ORDERED.